UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

LAURIE M. COOPER,                          }
                                           }
      Plaintiff,                    }
VS.                                        }   CIVIL ACTION NO. H-07-3161
                                           }
HEWLETT-PACKARD COMPANY                    }
DISABILITY PLAN,                           }
                                           }
      Defendant.                    }

## MEMORANDUM OPINION AND ORDER

Presently before the Court are Hewlett-Packard Company Disability Plan's Motion for Summary Judgment (Doc. 15), Hewlett-Packard Company Disability Plan's Memorandum of Points and Authorities in Support of Hewlett-Packard Company Disability Plan's Motion for Summary Judgment (Doc. 16), and Laurie M. Cooper's Response in Opposition to Hewlett-Packard Company Disability Plan's Motion for Summary Judgment for Summary Judgment (Doc. 19). For the reasons articulated below, the Court hereby ORDERS that Hewlett-Packard Company Disability Plan's Motion for Summary Judgment (Doc. 15) be GRANTED.

## I.       Background and Relevant Facts

Before the Court is Laurie M. Cooper's suit to reinstate Long Term Disability Benefits after final denial on appeal by Hewlett-Packard Company Disability Plan's plan administrator VPA. Cooper qualified initially for disability benefits because of chronic back pain. The plan administrator however terminated benefits after determining her condition had improved and she did not qualify as being unable to undertake "any occupation" for which she is or might be qualified. Although several doctors who treated Cooper were of the opinion she was disabled,

Cooper herself stated she felt better and would seek employment.  After her initial denial by VPA, but before conclusion of her appeal, Cooper began employment as a salesperson at a jewelry store.

**(i)  <u>The Requirements for Disability under the Hewlett-Packard Disability Plan.</u>**

The definition of "Totally Disabled" and "Total Disability" due to injury or sickness becomes progressively harder to meet for the participant in the Plan the longer he claims disability benefits.  For the initial twenty-six weeks, under §2(q)(i) of the Plan, disability is defined as where "the Participant is unable to perform the material and essential functions of his Usual Occupation at the Participating Company."  Doc. 17 at 00474.  Under §2(s) of the Plan, "Usual Occupation" is defined as "the customary work assigned to the Participant by the Participating Company which employs the Participant and performed on the Participant's customary schedule."  *Id*. at 00477.

For the period after twenty-six weeks and up to the conclusion of twenty-four months, under §2(q)(ii) of the Plan, disability is defined as where "the Participant is unable to perform the material and essential functions of his Own Occupation."  *Id*.  Under 2(j) of the Plan, "Own Occupation" is defined as "the type of work in which the Participant was engaged prior to the onset of his Total Disability and is not limited to the Participant's Usual Occupation or to jobs that provide any particular earnings level."  *Id*. at 00473.

After twenty-four months of claiming disability benefits, under §2(q)(iii) of the Plan, the participant must be able to show that she is "unable to perform any occupation for which she is or may become qualified by reason of [her] education, training or experience."  Doc. 17 at page 00474. With regards to disability under §2(q)(iii), the Plan states that "nervous or mental disorders shall be disregarded . . . ."  *Id*. at 00475.

Under § 2(b) of the Plan, VPA, Inc. serves as the claim administrator for the Plan, but not as the plan administrator.  Doc. 17 at 00470.  Under § 8(a) of the Plan, "[t]he Claims Administrator is the named fiduciary which has the discretionary authority to act with respect to any appeal from a denial of benefits."  Id. at 00501.  The HP Benefits Guide states that: "VPA . . . will have full and final discretion to determine entitlement to HP disability benefits in accordance with the terms of the plan."  Doc. 17 at 00982.

**(ii)**     **Cooper's Application for Disability under 2(q)(i) and 2(q)(ii) of the Plan for the first Twenty-Four Months.**

Cooper worked as a content manager for sixteen years at HP.  Doc. 17 at page 00013.  The job involved "writing documentation regarding how to accomplish certain technical solutions such as website creation, or product solution."  *Id*.  It appears to have been a sedentary task using as equipment only a computer and printer and sitting for between ten and twenty-four hours.  *Id*. at 00013-14.  In her application, Cooper complained "I'm in pain just filling this form out," and that she required six vicodin a day.  *Id*. at 00013.  The pain, as well as pressures from work and caring for her father, had left Cooper "suicidal."  *Id*.

On March 24, 2004, Cooper stopped working at HP.  Doc. 17 at page 00011-12.  On April 5, 2004 she signed the necessary forms to apply for short term disability benefits – under §2(q)(i) of the Plan -  dating her inability to work from March 25, 2004.  *Id*.  She was 43 years old.  *Id*. at page 00007.  At the request of VPA, to assess the application, Cooper provided progress notes from her treating physicians, Dr. Riaz Mazcuri and Dr. Mehboob Nazarani explaining that she suffered from chronic back pain, depression and bipolar disorder.  *Id*. at page 00018-27, 00038-41.  This was a low point in Cooper's life and before stopping work at HP she had attempted suicide once on March 12, 2004.  *Id*. at page 00040.  On May 19, 2004, her short-term counselor Georg Metcalf, in discussing the stress work placed on Cooper, advised she

remain unemployed until at least August 2004. Consequently, VPA approved short term
disability benefits for the twenty-six day period, under §2(q)(i) of the Plan, on April 20, 2004.

On June 10, 2004, VPA requested further medical and job history information from Cooper
to determine her eligibility for long term disability benefits for the twenty-four month period,
under §2(q)(ii) of the Plan. Doc. 17 at 00042. Cooper provided proof of her continuing chronic
back pain as well as depression and bipolar disorder from her treating physician, Dr. Arthur
Tullidge, ("Dr. Tullidge"). *Id*. at 00046-47, 00057-63. On August 12, 2004, VPA informed
Cooper she had qualified for the benefits under §2(q)(ii) effective September 23, 2004 stating
"the objective medical evidence . . . supports your inability to function in your own occupation."
*Id*. at page 00064. VPA noted in the letter Cooper should inform them if she re-entered the
workforce. *Id*.

### (iii). VPA's Initial Denial of Cooper's Application for Long Term Disability Benefits under §2(q)(iii) of the Plan requiring Cooper be Unable to Perform "Any Occupation."

On September 19, 2005, VPA again contacted Cooper regarding continuing
eligibility for disability benefits, now under §2(q)(iii) of the Plan. Doc. 17 at 00078-79. VPA
noted that under §2(q)(iii) of the Plan nervous and mental illnesses would be disregarded in
determining if Cooper was still disabled and that as of that date Cooper's disability was based on
bipolar disorder and depressive disorder as attested by Dr. Tullidge. *Id*. The §2(q)(ii) period of
benefits would end on March 25, 2006, and VPA gave Cooper the opportunity to present any
other diagnoses by any other treating physicians. *Id*.

For her §2(q)(iii) application, Cooper provided medical data relating to procedures she
underwent to reduce her chronic back pain as well as follow-up pain management after the
procedures. On October 11, 2005, Cooper underwent radiofrequncy ablation in her right lumbar

spine at MD Anderson Cancer Center.  Doc. 17 at 00081.  According to her pain management provider, Margarita Lyons ("Lyons"), Cooper again underwent radiofrequency ablation, this time of the median branches of her spine on October 20, 2005.  *Id*. at 00382.

On October 19, 2005, Cooper was admitted to Methodist Hospital Texas Medical Center for an anterior cervical discectomy and cervical fusion, attempting to decompress the median nerve performed by Dr. James Rose ("Dr. Rose").  *Id*. at 00133.  On November 1, 2005, Dr. Rose checked up on Cooper after the operation and noted that her neck and hand were healing well (she had also required surgery on her hand).  *Id*. at 00135.

On January 9, 2006, Lyons noted in her post-operative treatment of Cooper that Cooper was feeling "much, much better."  Doc. 133 at 00382-83.  Lyons stated: "She has been able to decrease all her medications and has started an exercise regimen, plans to lose weight, and is looking for a job."  *Id*.  She continued: "Currently, she is ranking her pain in the back area 2/10, usually it [sic.] 3-4/10, least pain 2/10, worse pain 6/10, and acceptable level 2 to 3/10."  *Id*.  Lyons noted further, "The patient has been doing remarkably well.  She has been able to decrease some of her medications.  She has noted she has a mild increase in anxiety; however, with regard to her pain, she is doing very well."  *Id*.  On January 12, 2006, Dr. Tullidge saw Cooper and noted that since the operation Cooper felt "so much better," that the pain was gone and that Cooper had better energy. Doc. 17 at 00275.

On April 10, 2006, Cooper returned for a follow-up visit to M.D. Anderson Cancer Center with Dr. Madhuri Are ("Dr. Are").  Doc. 17 at 00384.  Are noted Cooper now only took one Vicodin every few days and that she "had a good range of motion to her neck and cervical spine."  *Id*.  Cooper was in "no acute distress."  *Id*.  "She states that overall her worst pain is a 6, the least 2, it is usually a 2, right now it is a 4, and acceptable level is 4."

VPA decided on March 27, 2006, that before deciding to grant or deny benefits to Cooper under §2(q)(iii) a neurological Independent Medical Evaluation ("IME")  would have to take place.  Doc. 17 at 00308.   On April 19, 2006, Dr. Andres Keichian, ("Dr. Keichian") a neurologist did the IME.  Doc. 17 at 00210-212.   Dr. Keichian found that Cooper had a "moderate limitation of range of motion of the cervical and lumbar spine." *Id*. at 00211.  In evaluating her physical capabilities, Keichian determined that Cooper was able to stand, walk, sit, and drive for up to four hours each per day for up to one hour each at one time continuously; to occasionally lift up to 10 pounds, bend, squat, crawl, reach above shoulder level, and fine manipulate with both hands; and to frequently push/pull and simple grasp with both hands. *Id*. at 00214.

VPA referred Cooper's file, including the IME to a vocational consultant, Renee Lange "Lange").  Doc. 17 at 00221-00223.   On June 15, 2006, Lange used the medical history, including the physical capabilities assessed by Dr. Keichian, to identify current positions in Cooper's immediate vicinity she could take up. *Id*.  at 00222.  These were program manager, computer operations manager and department manager. *Id*.  Specifically, since Cooper could not sit or stand for more than one hour at a time, Lange noted that these occupations did not require sitting or standing for more than one hour but allowed for alternating positions. *Id*. at 00223. Furthermore, Lange noted these occupations allowed for modifications such as a sit/stand workstation. *Id*.

On June 26, 2006, VPA contacted Cooper and advised her they would deny her benefits because she could undertake "any occupation." Doc. 17 at 00311.  Cooper replied that she could not operate a computer, was in pain all the time and that Dr. Keichian, the IME doctor, had told her she could not work. *Id*.  VPA replied that Keichian's responsibility was to assess the range

of motion limitations and that it was not his realm of expertise to assess whether based on the range of motion limitations Cooper was able to work.  *Id.*  VPA told Cooper that instead the vocational consultant Lange had expertise on whether Cooper could work and had identified occupations Cooper could perform based on her range of motion limitations.  *Id.*

On July 19, 2006, VPA wrote a letter to Cooper denying the disability benefits under §2(q)(iii).  Doc. 17 at 00233-38.  The denial reviewed her medical history and the vocational consultant's report.  *Id.*  The denial letter concluded by informing Cooper she had the right to appeal the decision and could access all the records used in denying her benefits in her appeal.  *Id.*

**(iv)   Cooper's Appeal of her Denial of Disability Benefits under 2(q)(iii) and the Affirmation of the Denial on Appeal.**

On February 13, 2007, Cooper appealed the VPA's decision.  Doc. 105 at 00247.  In support of her appeal Cooper supplied an evaluation by Dr. Rose.  Doc. 100 at 00241.  Dr. Rose noted that her spine was healing well after the operation.  *Id.*  Rose also stated "I think your disability is a significant physical disability, which is due to your chronic condition in both upper and lower spine and this of course a condition [sic] which you have, which has prevented you from doing any meaningful work, especially doing your usual work, which is working at a computer and the like and writing."  *Id.*

On March 21, 2006, Dr. Tullidge treated Cooper and noted Cooper would "start [working at the] jewelry store next week" and that Cooper was "stable but not happy about the end of long term disability."  Doc. 111 at 00275.  On April 21, 2006, and June 28, 2006, Dr. Tullidge treated Cooper and noted she was working part time at 25 hours a week.  *Id.* at 00276.

On January 18, 2007, Cooper saw Dr. Are for a follow-up visit after an epidural injection to reduce pain.  Doc. 133 at page 00397.  Dr. Are categorized Cooper as being in chronic pain, rated her difficulty in thinking clearly as 4/10, and noted she was currently working as a sales clerk at a jewelry store.  *Id*.  Dr. Are also stated that Cooper had "chronic disabling pain" and that he "strongly doubt[ed]" she was able to work on a full-time basis.  *Id*.

VPA requested by letter copies of Cooper's pay stubs from her employment as a sales clerk.  Doc. 115 at page 00280.  Cooper worked between 28.44 and 92.61 hours per two week pay period, which averaged out to 4.6 hours a day over the period she was employed.  Doc. 131 at 00313-00337.

On July 11, 2006, Social Security Administration denied Cooper's application for disability benefits, a decision based on her work and the money she was earning therefrom.  Doc. 95 at 00228.  On May 16, 2007, VPA denied Cooper's claim on appeal.  Doc. 120 at 00286-288. VPA reasoned that Cooper's current work as a sales clerk demonstrated she was capable of "any occupation" under 2(q)(iii).  *Id*.  VPA noted that Cooper had requested further information from Dr. Keichian, the doctor who had performed the IME, but that Dr. Keichian had not yet responded.  *Id*.  On May 23, 2007, Dr. Keichian responded to Cooper's request for clarification as to his IME for VPA by stating that "[i]in view of her medical pathology, Ms. Cooper is totally disabled and unable to be gainfully employed."

## II.        Summary Judgment Standard

A party moving for summary judgment must inform the court of the basis for the motion and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R.

Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003).  The substantive law governing the suit identifies the essential elements of the claims at issue and, therefore, indicates which facts are material.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The initial burden falls on the movant to identify areas essential to the nonmovant's claim in which there is an "absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005).  If the moving party fails to meet its initial burden, the motion must be denied, regardless of the adequacy of any response.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

Once the movant meets its burden, however, the nonmovant must direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial.  *Celotex*, 477 U.S. at 323-24.   The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indust. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citing *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).  Instead, the non-moving party must produce evidence upon which a jury could reasonably base a verdict in its favor.  *Anderson*, 477 U.S. at 248; *see also DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005).   To do so, the nonmovant must "go beyond the pleadings and by [its] own affidavits or by depositions, answers to interrogatories and admissions on file, designate specific facts that show there is a genuine issue for trial." *Webb v. Cardiothoracic Surgery Assoc. of North Texas, P.A.*, 139 F.3d 532, 536 (5th Cir.1998).  Unsubstantiated and subjective beliefs and conclusory allegations and opinions of fact are not competent summary judgment evidence.  *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998); *Grimes v. Texas Dept. of Mental Health and Mental Retardation*, 102 F.3d 137, 139-40 (5th Cir. 1996); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994), *cert.*

*denied*, 513 U.S. 871 (1994);  *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992), *cert. denied*, 506 U.S. 825 (1992).  Nor are pleadings summary judgment evidence.  *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1046 (5th Cir. 1996) (citing *Little*, 37 F.3d at 1075).  The non-movant cannot discharge his burden by offering vague allegations and legal conclusions.  *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992); *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 889 (1990).  Nor is the court required by Rule 56 to sift through the record in search of evidence to support a party's opposition to summary judgment. *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Skotak v. Tenneco Resins*, Inc., 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992)).

Nevertheless, all reasonable inferences must be drawn in favor of the non-moving party.  *Matsushita*, 475 U.S. at 587-88; *see also Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).  Furthermore, the party opposing a motion for summary judgment does not need to present additional evidence, but may identify genuine issues of fact extant in the summary judgment evidence produced by the moving party.  *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 198-200 (5th Cir. 1988).  The non-moving party may also identify evidentiary documents already in the record that establish specific facts showing the existence of a genuine issue. *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990).  In reviewing evidence favorable to the party opposing a motion for summary judgment, a court should be more lenient in allowing evidence that is admissible, though it may not be in admissible form.  *See Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.,* 831 F.2d 77, 80 (5th Cir. 1988).

**III.**        <u>Discussion</u>

**A.**        <u>Abuse of Discretion Standard Under ERISA</u>

      Where a benefit plan grants the plan administrator discretion to construe the plan's terms or make eligibility determinations, courts apply an abuse of discretion standard of review and analyze whether the plan administrator acted arbitrarily or capriciously. *Gosselink v. American Tel. & Tel. Inc.*, 272 F.3d 722, 726 (5th Cir. 2001). The Fifth Circuit employs a two-part test, articulated in *Wildbur v. ARCO Chemical Co.*, 974 F.2d 631, 637-38 (5th Cir. 1992), when analyzing a plan administrator's interpretation of a benefit plan.[1] *Rigby v. Bayer Corp.*, 933 F. Supp. 628, 632 n.2 (E.D.Tex. 1996) (citations omitted). However, when a case does not turn on "sophisticated plan interpretation issues," this test does not apply. *Id.* "The only standard in reviewing a factual determination is abuse of discretion." *Id.*

      Judicial review of an administrator's decision is "limited to determining whether there is substantial evidence in the record to support [the administrator's] decision that in-patient ca[r]e was medically unnecessary or whether its refusal to pay the submitted claims was arbitrary." *Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Mich.*, 97 F.3d 822, 828 (5th Cir. 1996) (citing *Duhon v. Texaco, Inc.*, 15 F.3d 1302, 1306 (5th Cir.1994)). "A decision is arbitrary when made 'without a rational connection between the known facts and the decision or between the found facts and the evidence.'" *Lain v. UNUM Life Ins. Co. of Am.*, 279 F.3d 337, 342 (5th

---

[1] Under the two-pronged, six-part *Wildbur* test, the Court must first determine the legally correct interpretation of the plan. *Gosselink*, 272 F.3d at 726 (citing *Wildbur*, 974 F.2d at 637-38). To make this determination, the court must consider: (1) whether the administrator has given the plan a uniform construction; (2) whether the interpretation is consistent with a fair reading of the plan; and (3) any unanticipated costs resulting from different interpretations of the plan. *Id.* (citing *Wildbur*, 974 F.2d at 637-38).
    If the court determines that the plan administrator's interpretation of the plan is legally incorrect, then the court must decide whether the plan administrator's decision was an abuse of discretion. *Gosselink*, 272 F.3d at 726. These three factors are important in the Court's analysis: (1) the internal consistency of the plan under the administrator's interpretation; (2) any relevant regulations formulated by the appropriate administrative agencies; and (3) the factual background of the determination and any inferences of bad faith. *Id.* (citing *Wildbur*, 974 F.2d at 638).

Cir. 1996) (quoting *Bellaire Gen. Hosp.*, 97 F.3d at 828).  The administrator's denial of benefits

must be "based on evidence, even if disputable, that clearly supports the basis for its denial."

*Lain*, 279 F.3d at 342 (quoting *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d at 287, 299 (5th Cir.

1999)).

    "The law requires only that substantial evidence support a plan fiduciary's

decisions, including those to deny or to terminate benefits."  *Ellis v. Liberty Life Assur. Co. of*

*Boston*, 394 F.3d 262, 273 (5th Cir. 2004) (citing *Meditrust Fin. Servs. Corp. v. Sterling Chem.,*

*Inc.*, 168 F.3d 211, 215 (5th Cir. 1999)).  "Substantial evidence is more than a scintilla, less than

a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion."  *Deters v. Secretary of Health Educ. And Welfare*, 789 F.2d 1181, 1185

(5th Cir. 1986) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

## B.        Procedural Challenge to VPA's review

    Cooper argues that she was denied the full and fair review mandated by section 1133(2)

because VPA did not provide review of its specific basis for rejecting her claim.  In relevant part,

ERISA provides:

>  In accordance with regulations of the Secretary, every employee benefit plan
> shall--
>
> (1) provide adequate notice in writing to any participant or beneficiary whose
> claim for benefits under the plan has been denied, setting forth the specific
> reasons for such denial, written in a manner calculated to be understood by the
> participant, and
>
> (2) afford a reasonable opportunity to any participant whose claim for benefits has
> been denied for a full and fair review by the appropriate named fiduciary of the
> decision denying the claim.

29 U.S.C. § 1133 (2000). Challenges to ERISA procedures are evaluated under the substantial

compliance standard. *See Lacy v. Fulbright & Jaworski*, 405 F.3d 254, 257 (5th Cir. 2005);

*Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 775 (7th Cir. 2003); *Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 460 (6th Cir. 2003). This means that "technical noncompliance" with ERISA procedures "will be excused" so long as the purposes of section 1133 have been fulfilled. *White v. Aetna Life Ins. Co.*, 341 U.S. App. D.C. 155, 210 F.3d 412, 414 (D.C. Cir. 2000).

Cooper relies on *Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 393 (5th Cir. 2006), where the plaintiff was initially denied disability benefits on the grounds that his vision had improved sufficiently, but was subsequently denied benefits on appeal on different grounds, namely that good vision was not necessary to meet the definition of 'capable of employment' under that plan.  The court in *Robinson* held that "[s]ubsection (1)'s mandate that the claimant be specifically notified of the reasons for an administrator's decision suggests that it is those "specific reasons" rather than the termination of benefits generally that must be reviewed under subsection (2)."  *Id.*  In other words, Robinson had been denied his procedural rights under ERISA because he did not have a full opportunity to gain administrative review of the contention that good vision was not necessary for the plan to find him 'capable of employment.'

*Robinson* is inapposite here as the facts differ.  VPA has not shifted the grounds for denial thereby denying Cooper any chance for a review of the real decision for her denial. Cooper contends that on review of her denial the VPA focused exclusively on her employment as a sales clerk at a jewelry store, as demonstrating she was no longer disabled, rather than the grounds for her initial denial, that her medical evaluations showed an improved condition.  Thus Cooper argues she did not have an opportunity to challenge the denial on the basis of her new employment by, for example, arguing that the position was only part-time.

While it is true that the VPA weighed her new employment as strong evidence that she was no longer disabled, Cooper was not denied her procedural rights in the same fashion as the plaintiff in *Robinson* because, unlike him, Cooper lost on appeal on the same specific grounds: her improved medical condition.  The review letter denying Cooper's claim on appeal noted that Cooper had to establish she was disabled, under 2(q)(iii) of the plan, by March 25, 2006, the day her initial period of disability benefits under another part of the plan, 2(q)(ii), ended.  The letter noted that on January 9, 2006, less than three months before the date she needed to qualify for long term disability under 2(q)(iii) of the plan, she was evaluated by the Anderson Cancer Center.  It was at that evaluation that Cooper was assessed as feeling decreased symptoms, requiring less medication, undertaking an exercise regimen and looking for employment.  The review letter, therefore, affirmed denial on appeal because of improved medical status before Cooper obtained employment.

Her employment, which started after the initial denial on March 25, 2006, was inevitably relied upon, with hindsight, to confirm VPA's initial conclusions, based on the medical evidence, that Cooper was capable of performing "any occupation," as required under 2(q)(iii) of the plan. This does not change the fact, however, that Cooper would have still lost on appeal even if she had not been discovered to be working by VPA, because Cooper failed to overturn VPA's initial conclusion that Cooper's medical condition had improved to the point where she was capable of performing "any occupation."  VPA focused on a medical evaluation soon before the relevant date at which to assess Cooper's condition.  The clear implication was that the VPA was assessing Cooper as of March 25, 2006, and that her employment as a sales clerk, which followed March 25, was confirmation of, rather than the basis of, the denial.  Furthermore, the equity present in *Robinson*, where an entirely different tack was adopted by the plan

administrator on review than on initial denial, is not present here, where there is such a close causal nexus between the proposition that Cooper was in less pain and capable of seeking employment as of March 25, 2006, and the corollary argument that Cooper had in fact started employment after March 25, 2006.

### C.             Substantial Evidence Supporting VPA's Denial of Disability Benefits.

Cooper relies heavily on the fact three doctors, Dr. Rose, Dr. Keichian and Dr. Are, gave statements to the effect she was incapable of "gainful employment," "meaningful work" and "full-time work."  Although this evidence must be given some weight it does not convince the Court that there lacked substantial evidence to support VPA's decision that Cooper was not disabled as defined under 2(q)(iii) of the plan.  The doctors who evaluated Cooper noted her improved medical condition, but determined she was disabled from work based on a misunderstanding of the definition of disability under the plan.  Dr. Keichian, after conducting the IME, spoke on May 23, 2007, of Cooper being unable to take on "gainful employment."  Dr. Rose, during an evaluation in February 13, 2007, spoke of Cooper being unable to do "meaningful work."  On January 18, 2007, Cooper saw Dr. Are for a follow-up visit after an epidural injection to reduce pain and Dr. Are stated he "strongly doubted she could undertake full-time work."

Under the plan, however, after the initial twenty-four month period of disability, as required by 2(q)(iii), Cooper was required to demonstrate she was unable to perform "any occupation." Importantly, there were no limitations as to earnings level, or whether the work was "meaningful" or "gainful employment." The plan had a graduated scale, as time progressed after leaving employment, that imposed increasingly stringent requirements to qualify for disability. Under 2(q)(i) it sufficed to be unable to perform one's "own occupation," in other words, exactly

the same work as was being then undertaken for the employer.    Under 2(q)(ii) the type of occupation was loosened to one's "usual occupation," in other words in the same field of work, with no limitation on earnings level.    Finally, under 2(q)(iii) of the plan, applicable to benefits Cooper was denied and at issue here, Cooper had to show she was "unable to perform any occupation for which she is or may become qualified by reason of [her] education, training or experience."    This last definition of employment was phrased as broadly as possible to include not only any position Cooper could take but also any position Cooper could take after proper training.

Before Cooper began work, VPA was made aware by the vocational consultant that Cooper was capable of performing three occupations: program manager, computer operations manager and department manager. Furthermore, on January 9, 2006, at an evaluation at Anderson Cancer Center, Cooper noted she was feeling "much, much better."    Lyons, the treating doctor, noted Cooper had been able to decrease all medications, had started an exercise regimen, planned to lose weight and was looking for a job.    The fact that Cooper did, a few months later, start employment tends to confirm the VPA was right in relying on the signs of improvement shown by the vocational consultant's report and Lyons' evaluation.    By the plaintiff's own admission, Cooper took up her position as a sales clerk to support herself after the termination of her benefits.    That she is able to support herself through employment negates the claim that she is unable to undertake "any occupation."

It also notable that Cooper qualified wholly on the grounds of mental or nervous disorders for her initial twenty-four month period of disability.    Under the definition of disability under 2(q)(iii) of the plan, however, mental or nervous disorders are disregarded and Cooper presented insufficient evidence that chronic back pain, on its own, prevented her from working at

"any occupation."   Thus, VPA has succeeded in demonstrating that there was substantial evidence in support of its determination that under the terms of the plan being administered Cooper was no longer disabled and did not qualify for continuing benefits.

**IV.**   **Conclusion.**

Therefore, for the foregoing reasons, it is hereby

ORDERED that Defendant Hewlett-Packard Company Disability Plan's Motion for Summary Judgment (Doc. 15) is GRANTED.

SIGNED at Houston, Texas, this 14th day of January, 2009.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE